## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **FIDELITY & GUARANTY LIFE** | * | |
| **INSURANCE CO.,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Case No. JFM-13-40** |
| | * | |
| **UNITED ADVISORY GROUP, INC.** | * | |
| **d/b/a QINTERA FINANCIAL GROUP,** | * | |
| **JAMES STODDARD, and JOSEPH** | * | |
| **ROOSEVANS,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiff Fidelity & Guaranty Life Insurance Company ("Fidelity") sued Defendants United Advisory Group, Inc., doing business as Qintera Financial Group ("Qintera"), Joseph Roosevans ("Roosevans"), and James Stoddard ("Stoddard"), for breach of contract and unjust enrichment, and sued Defendants Roosevans and Stoddard personally for breach of contract on a theory of piercing the corporate veil due to fraud.  *See* [ECF No. 63].   Only Defendants Roosevans and Qintera, and not Defendant Stoddard, are party to the instant discovery motions.[1] *See* [ECF Nos. 102, 105].   Pursuant to the referral of this case to me for discovery and related scheduling matters, I have reviewed Defendants' Joint Motion for Protective Order, Motion to Strike and for Sanctions ("Motion to Strike"), and the related Oppositions and Replies thereto. [ECF Nos. 102, 105, 121, 122, 124, 126].   I have also reviewed non-parties The Paragon Trust

---

[1] Where appropriate, then, Defendants Roosevans and Qintera are referred to as "Defendants" herein.

and Paragon Financing Services, LLC's (collectively, "the Paragon entities")[2] Motion to Quash

Subpoenas *duces tecum* issued to them by Fidelity, and the Opposition and Reply thereto.  [ECF

Nos. 115, 123, 129].  No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2014).  For the reasons

set forth herein, Defendants' Joint Motion for Protective Order will be DENIED, Defendants'

Motion to Strike will also be DENIED, and the Paragon entities' Motion to Quash will be

DENIED, with the qualification that the subpoenas' response times will be modified.

## I.    BACKGROUND

The instant dispute arises from an August 1, 2012 loan agreement ("the Loan

Agreement") between Fidelity and all Defendants, wherein Fidelity agreed to lend Qintera

$500,000.00 in exchange for Qintera's marketing Fidelity's insurance products.  *See* Pl.'s Am.

Compl. ¶ 2.  In June, 2012, prior to the execution of the loan, Fidelity's representatives met with

Defendants Stoddard and Roosevans to negotiate the terms of the Loan Agreement.  *Id.* at ¶ 23.

During the negotiations, all Defendants prepared and presented Qintera's "Business Plan

Executive Summary" and "Implementation Plan," two documents that contained information

about Qintera's characteristics as a company, its business model, its financial condition, its

strategies and timeline for growth and profit, its executive team and advisory board, its "carrier

partner target forecast," its income statement, and its plan for implementing its growth strategy.

*Id.* at Ex. F and G.  The Business Plan Executive Summary refers to Qintera as an "affiliate" of

Financial Resources of America ("FRA").  *Id.* at ¶ 29.  The Implementation Plan contains

numerous references to Qintera's use of FRA's policies, personnel, and resources.  *Id.* at ¶¶ 34-

37, Ex. G.

---

[2] According to Defendant Roosevans's deposition, Defendant Roosevans is a beneficiary of The Paragon Trust and was the trustee of The Paragon Trust in 2012.  Roosevans Dep. Tr. 99:2-7.  The Paragon Trust was also a shareholder of Defendant Qintera in 2012, *see id.* at 149:3-10, and, according to the Paragon entities' Motion to Quash,  The Paragon Trust is currently a shareholder in Defendant Qintera.  Mot. to Quash 2.  Paragon Financing Services, LLC is a separate company owned by Defendant Roosevans.  *Id.*

Fidelity and all Defendants executed the Loan Agreement in August, 2012.  On August 23, 2012, Fidelity wired $500,000.00 to Qintera's bank account.  *Id.* at ¶ 3.  Under the terms of the Loan Agreement, the maturity date of the loan was to be December 31, 2014.  *Id.* at ¶ 5.  However, the Loan Agreement also specified that Fidelity had an automatic right to accelerate or demand full payment of the loan.  *Id.* at ¶ 5, Ex. A.  Fidelity alleged that it made demand for full payment on October 24, 2012, and that, "[d]espite due demand having been made," Defendants failed and refused to pay the principal amount of the loan.  *Id.* at ¶¶ 7, 8.  On January 4, 2013, Fidelity filed its initial Complaint in this Court, alleging counts for breach of contract against all Defendants, breach of contract against Defendants Stoddard and Roosevans individually, and unjust enrichment.  *See* [ECF No. 1].  Fidelity filed a motion for leave to amend its Complaint in June, 2013, which was granted in part and denied in part in a Memorandum Opinion issued by Judge Quarles on January 29, 2014 ("the 2014 Memorandum Opinion").  *See Fidelity & Guaranty Life Ins. Co. v. United Advisory Grp., d/b/a Qintera*, No. WDQ-13-0040, 2014 WL 346630 (D. Md. Jan. 29, 2014).

The 2014 Memorandum Opinion permitted Fidelity to amend its Complaint to include the following: an amendment of its breach of contract claim to be against Defendants Qintera, Roosevans, and Stoddard, rather than "All Defendants," an amendment of its breach of contract claim against Defendants Stoddard and Roosevans individually to include a theory of reaching those individuals "by piercing the corporate veil due to fraud," and an amendment of its claim for unjust enrichment to be "against Defendants Qintera, Stoddard, and Roosevans."  *See id.* at *6-9.  As to the Fidelity's claim of breach of contract against Stoddard and Roosevans individually by piercing the corporate veil, Judge Quarles ruled that, "as the amended complaint states a claim for piercing the corporate veil by *fraud*, the amendment is not futile," and allowed

Fidelity to pursue its piercing claim on a fraud theory.  *Id.* at *9 (emphasis added).  Judge Quarles also held, however, that "the amended complaint only asserts a claim for veil piercing based on fraud, rather than 'paramount equity,' which takes into account factors indicating a 'disregard of the corporate fiction.'"  *Id.* at *9 n.38.  Judge Quarles noted that "if Fidelity wants to assert a claim for veil piercing against Stoddard and Roosevans on a basis other than fraud, it must seek to amend its Complaint accordingly."  *Id.*

Discovery proceeded following the issuance of the 2014 Memorandum Opinion.  In March, 2015, counsel for Defendants raised objections to certain deposition questions of Qintera's corporate designees on the theory that the deposition questions were designed to pursue a claim for piercing based on the need to enforce a paramount equity, which the Court had ruled was non-existent in Fidelity's Amended Complaint.  *See* Defs.' Mot. for Protective Order Ex. A.  Counsel for Defendants informed counsel for Fidelity by e-mail that he believed such discovery to be related only to paramount equity factors, and therefore to be in bad faith, and "suggest[ed]" to counsel for Fidelity that Fidelity seek leave to amend its Complaint to include a claim for piercing based on paramount equity if it wished to pursue the disputed discovery.  *Id.*  Fidelity filed a motion for leave to amend its Complaint for a second time to include a paramount equity claim on April 7, 2015.  *See* [ECF No. 101].  On January 12, 2016, Judge Quarles denied Fidelity's motion.  *See* [ECF Nos. 130, 131].

## II.    DISCUSSION

### A.  Procedural Matters

#### 1.  Defendants Roosevans and Qintera's Allegations of Bad Faith and Fidelity's Failure to Comply with Local Rule 104.7

Defendants assert that Fidelity violated this Court's Local Rules by not attempting to resolve the discovery disputes before filing its motion for leave to amend.[3] Local Rule 104.7 requires parties to "confer with one another concerning a discovery dispute and make sincere attempts to resolve the differences between them." Loc. R. 104.7 (D. Md. 2014). While both parties debate the sincerity of the other's attempts to resolve the pending discovery disputes, the record reflects that counsel for Fidelity made a sufficient effort. After receiving e-mail correspondence from counsel for Defendants indicating that Defendants perceived much of Fidelity's discovery to be related only to a paramount equity claim, counsel for Fidelity disagreed, but responded that Fidelity would be "amenable to requesting a conference call with Judge Quarles," as suggested by defense counsel. *See* Pl.'s Opp. to Defs.' Mot. for Protective Order Ex. A. After Judge Quarles denied the parties' request for a conference call, *see id.*, Fidelity filed a motion seeking leave to amend its Complaint for a second time to add a paramount equity claim. *See* Defs.' Mot. to Strike Ex. A.

Fidelity filed its motion on the same day that Judge Quarles declined to intervene to resolve the discovery dispute through a conference call, thus demonstrating that Fidelity had "both prepared [its] motion to amend and sought Defendants' consent to file it before being told chambers had declined to intervene." Defs.' Mot. to Strike 8. However, that conduct does not

---

[3] Defendants' assertion that Fidelity has failed to engage in sincere discovery dispute resolution is ironic given their own failure to comply with the same Local Rule they accuse Fidelity of violating. In addition to requiring parties to confer with one another concerning discovery disputes before seeking judicial intervention, Local Rule 104.7 states that the Court "will not consider any discovery motion unless the moving party has filed a certificate" regarding the details of the "meet and confer" and itemizing the issues requiring the Court's resolution. *See* Loc. R. 104.7 (D. Md. 2014). In the instant case, Defendants have provided no such certificate, and, instead, merely insert a footnote in their motion to strike asserting that "counsel . . . certifies that it has attempted to resolve this discovery dispute with counsel for Plaintiff, and conferred with counsel for other parties in this matter, prior to the instant filing." This is insufficient under Local Rule 104.7. *See Madison v. Harford Cnty., Md.*, 268 F.R.D. 563, 564-65 (D. Md. 2010) ("Plaintiffs' so-called certificate does not contain any of the details required by Local Rule 104.7. . . . Because Plaintiffs' certificate is defective, the Court is not required to hear their motion."). I have nevertheless chosen to resolve the disputes on their merits so that the litigation may proceed.

constitute bad faith or noncompliance with Local Rules.  Parties are free to prepare motions or

memoranda in anticipation of filing them, even absent certainty that they will need to be filed.

Moreover, counsel for Fidelity did not file the motion for leave to amend until after receiving

notice that Judge Quarles did not think a conference call would be productive or necessary.  *See*

Pl.'s Opp. to Defs.' Mot. for Protective Order Ex. B.  Here, where Defendants' counsel explicitly

"suggest[ed]" that Fidelity "file an amended complaint explicitly adding [a] theory of paramount

equity" if Fidelity "legitimately wish[ed] to pursue [a paramount equity] line of inquiry,"

Fidelity's preparation of its motion to amend prior to this Court's declining to intervene cannot

be taken as an act of bad faith.

### 2.  Defendants' Objections to the Disputed Discovery

In its Opposition to Defendants' Joint Motion for Protective Order, Fidelity argues that

Defendants "never raised any objection to discovery based on paramount equity or notified

Plaintiff that they deemed such discovery to be prohibited . . . until *after* almost all discovery had

taken place, and discovery was nearly over."  Pl.'s Opp. to Defs.' Mot. for Protective Order 14

(emphasis in original).  Fidelity thus contends that granting the Motion for Protective Order, and

the Motion to Strike, would be "prejudicial and unreasonable."  *Id.*

The assertion that Defendants did not object to disputed deposition testimony based on

paramount equity until after almost all discovery had occurred is belied by the record.  Counsel

for Defendants complied with Federal Rule of Civil Procedure 30(c), which requires parties to

note objections to deposition questions on the record at the time of the deposition examinations.

*See* Fed. R. Civ. P. 30(c).  Transcripts from corporate designees Patricia Young and Defendant

Roosevans's depositions reveal that counsel for all Defendants objected to the lines of deposition

questioning which counsel believed to be related solely to a paramount equity theory.  *See, e.g.*,

Young Dep. Tr. 26:4-11 ("Q: Are you familiar with the organizational structure of FRAA, Inc.?"

6

"Mr. Swafford [counsel for Roosevans and Qintera]: Objection.   Again, I mean, this entire line of questioning, it's not relevant. . . . It's just in her personal capacity.   Nothing to do with her corporate capacity with Qintera."); *id.* at 51:1-11 ("Mr. Swafford: [J]ust for the record again, this is a corporate deposition. . . . And while there may be fraud allegations in the complaint, none of them involve other entities other than Qintera, UAG, and potentially FRA, but none of the other entities . . . [n]one of them are mentioned, even alluded to, in the complaint. . . . So I'm going to continue to object on relevance ground on that."); Roosevans Dep. Tr. 8:4-11 ("Mr. Swafford: [I]n this particular case there was a series of questions yesterday [during Ms. Young's deposition] about other entities.   I objected saying that they weren't in the scope of the notice or in the subject matter of the complaint.   I need to make sure that all the objections for that line of questioning, just to preserve the right so I can do a protective order.").

Fidelity is correct, however, that Defendants' April, 2015 objections to Document Production Requests Nos. 1, 2, and 3, which were issued on February 3, 2015, are untimely.  *See* Fed. R. Civ. P. 34(c)(A) ("The party to whom the [document production] request is directed must respond in writing within 30 days after being served."); *Hall v. Sullivan*, 231 F.R.D. 468, 473 (D. Md. 2005) (noting that Federal Rule 33, which governs interrogatories, provides that objections to interrogatories are waived if not timely filed, and finding that, while "[t]here is no similar provision in Rule 34," which governs document requests, "[i]f one looks at the commentary to Rule 34 . . . it is clear that the procedures under Rule 34 were intended to be governed by the same procedures under Rule 33.").   An objecting party may only issue untimely objections to document requests upon a showing of good cause.  *Id.*

Here, Defendants argue that their delay can be excused because Fidelity "did not begin to heavily pursue such a [paramount equity] theory through discovery until discovery resumed

[after multiple stays granted by the Court] in February, 2015, following a lull as this Court entertained Defendants' motion to add a counterclaim." Defs.' Reply to Pl.'s Opp. to Defs.' Mot. for Protective Order ¶ 38. I find this excuse unpersuasive and insufficient to show good cause. Accordingly, Defendants' relevance objections to Document Requests Nos. 1, 2, and 3 are waived.[4]

## B. Defendants Roosevans and Qintera's Motion for Protective Order

### 1. Legal Standard

Parties may obtain discovery "regarding any non-privileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Under Federal Rule of Civil Procedure 26(b), relevance, rather than admissibility, governs whether information is discoverable. *See* Fed. R. Civ. P. 26(b)(1); *Herchenroeder v. Johns Hopkins Univ. Applied Physics Lab*, 171 F.R.D. 179, 181 (D. Md. 1997). Information sought need only "appear[] [to be] reasonably calculated to lead to the discovery of admissible evidence" to pass muster. *See Innovative Therapies, Inc. v. Meents*, 302 F.R.D. 364, 377 (D. Md. 2014). However, even in the case of relevant information, "the simple fact that requested information is discoverable under Rule 26(a) does not mean that discovery must be had." *Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 543 (4th Cir. 2004). Instead, Rule 26(b) inserts a proportionality requirement into the amount and content of the discovery sought, and requires courts to consider the "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to

---

[4] Even if these objections were not waived, a protective order would still not be warranted for the responses to the disputed document requests because the requests are otherwise relevant to the instant litigation, as set forth herein. Fidelity's Document Requests Nos. 1 and 3 are relevant to its allegations that Qintera was held out as an affiliate of FRA, and that Qintera would leverage its affiliation with FRA. Indeed, Qintera and Roosevans admit that Request No. 1 is "arguably relevant to other claims in the First Amended Complaint." Defs.' Mot. to Strike ¶ 11 n.9. Likewise, Request No. 2, which seeks "evidence of payment of franchise tax or other corporate fees, annual reports, and fees to remain registered as a foreign corporation," is relevant to existing allegations of undercapitalization in the Amended Complaint. *See* Pl.'s Am. Compl. ¶¶ 43, 44, 54.

relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Significantly, Rule 26(c)(1) permits courts to, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1).

Where a protective order is sought, the moving party bears the burden of establishing good cause. *Webb v. Green Tree Servicing, LLC*, 283 F.R.D. 276, 278 (D. Md. 2012). To determine whether the movant has met his burden, the court must balance the "interest of a party in obtaining the information versus the interest of his opponent in keeping the information confidential or in not requiring its production." *UAI Tech., Inc. v. Valutech, Inc.*, 122 F.R.D. 188, 191 (M.D.N.C. 1988). In other words, "the Court must weigh the need for the information versus the harm in producing it." *A Helping Hand, LLC v. Baltimore Cnty., Md.*, 295 F. Supp. 2d 585, 592 (D. Md. 2003) (internal quotation marks omitted). Despite the broad discretion conferred on trial courts to "decide when a protective order is appropriate and what degree of protection is required," *see Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984), the standard for issuance of a protective order is high. *Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 125 (D. Md. 2009); *id.* at 121 ("Although the Fourth Circuit . . . has not explicitly held that a First Amendment right of access exists with regard to non-dispositive civil motions and hearings, the precedent strongly favors that view, with the higher burden for sealing.").

### 2. Analysis

#### i. Relevance of the Disputed Discovery

Defendants Qintera and Roosevans seek a protective order for the following discovery: (1) any questions asked or answers received during Qintera's corporate designee Patricia Young's deposition related to undercapitalization, Qintera's respective relationships with United

Advisory Group, LLC, FRAA, Inc., FRA, The Paragon Trust, and Paragon Financing Services, LLC, Qintera's corporate form and formalities, functioning officers and directors, and, finally, the comprehensiveness of Qintera's corporate records (pages 22-29, 35-43, 47, 59-60, 62-64, 110-111, 132-133, 164, and 181 of Ms. Young's deposition); (2) any questions asked or answers received during Defendant Roosevans's deposition in his capacity as Qintera's corporate designee related to Qintera's solvency, corporate form, officers and directors, and corporate records (pages 14, 25, 28-29, 30, 31-32, 40, 42-54, 55-60, 68-70, 73-75, 77-80, 85-87, and 89-90 of Defendant Roosevans's deposition); and (3) any information contained in the answers to Fidelity's subpoenas presented to the Paragon entities.

Defendants argue that the disputed discovery taken by Fidelity "could only be considered relevant under a claim of paramount equity." Defs.' Mot. for Protective Order ¶ 17 (internal quotation marks and emphasis omitted). Based on their having to "incur[] the cost of responding to overbroad discovery requests, attending depositions scheduled as fishing expeditions, and retaining separate attorneys to resist irrelevant subpoenas," Defendants claim that they are entitled to a "blanket protective order" and an award of costs as sanctions. *Id.* at ¶¶ 42, 43.

Maryland courts[5] permit corporate veil piercing upon either a showing of fraud, or a showing of the need to enforce a paramount equity. *See Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 306-307, 728 A.2d 783, 789 (1999). In alleging fraud as the basis for veil piercing to reach an individual, a plaintiff must show that the individual used corporate entities to perpetrate a fraud against the plaintiff. *See Antigua Condo. Ass'n v. Melba Investors Atl., Inc.*, 307 Md. 700, 735, 517 A.2d 75, 93 (1986); *Harte-Hanks*

---

[5] Pursuant to Judge Quarles's rulings, I adopt Maryland law in examining the veil piercing doctrines. *See Fidelity & Guaranty Life Ins. Co.*, 2014 WL 346630, at *5 ("[T]he Court will apply Maryland law to determine whether to pierce the corporate veil."); *Fidelity & Guaranty Life Ins. Co. v. United Advisory Grp., Inc.*, No. WDQ-13-0040, 2016 WL 158512, at *3 n.1 (D. Md. Jan. 12, 2016) (upholding the previous application of Maryland law).

*Direct Mktg./Baltimore, Inc. v. Varilease Tech. Fin. Grp., Inc.*, 299 F. Supp. 2d 505, 514-15 (D. Md. 2004).   In Maryland, the elements of fraud are as follows: (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation. *Hoffman v. Stamper*, 385 Md. 1, 28, 867 A.2d 276, 292 (Md. 2005).

Moreover, where a corporation is used as a "mere shield" for perpetrating the fraud, piercing may be proper.   *See Bart-Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275 Md. 295, 309, 340 A.2d 225 (1975); *Dixon v. Process Corp.*, 38 Md. App. 644, 651, 382 A.2d 893, 898 (1978) ("The [Maryland] Court of Appeals has indicated that in an appropriate case it will hold liable in equity the alleged chief actor of the perpetration of a fraud accomplished through the medium of a corporate fiction where the principal actor is asserted to have dominated and controlled the intervening corporate entities, and, through that domination and control, to have accomplished his personal ends and enterprises."); *Colandrea v. Colandrea*, 42 Md. App. 421, 432-33, 401 A.2d 480, 486-87 (1979) (piercing the corporate veil upon a finding that "Cortland Realty Ltd., through its president, Mrs. Colandrea, entered into the stock redemption agreement with the deliberate intention and purpose of cheating and defrauding Mr. Colandrea, the other party to the contract," and noting that "[t]he Court of Appeals has given fair warning as to the repercussions of such fraudulent acts of an agent: In such a case not only is the corporation liable for such action, but the agents who engage in the conspiracy are personally liable for damages resulting from such a transaction. . . . Mrs. Colandrea obviously had no intention of permitting payment of

the promissory notes . . . [t]he evidence presented by Mr. Colandrea meets all of the elements of fraud in accordance with the applicable burden of proof.") (citing *Ace Development Co. v. Harrison*, 196 Md. 357, 367, 76 A.2d 566, 570 (1950); *Appel v. Hupfield*, 198 Md. 374, 382, 84 A.2d 94, 97 (1951) ("[W]here one person induces another to part with his money or property by means of a promise which he makes with the intention of not performing it, he is guilty of actionable fraud.")).   In the 2014 Memorandum Opinion, Judge Quarles ruled that Fidelity had sufficiently stated a claim for piercing the corporate veil based on fraud under Maryland law. *See Fidelity & Guaranty Life Ins. Co.*, 2014 WL 346630, at *9.

In addition to cases involving fraud, the corporate fiction may be disregarded to enforce a paramount equity.  However, since no Maryland court, nor any court in this district, has pierced the corporate veil on paramount equity grounds, the circumstances under which the corporate fiction would be disregarded absent fraud are less well-defined.  *See Serio v. Baystate Properties, LLC*, 209 Md. App. 545, 561, 60 A.3d 475, 485 (2013) ("[N]otwithstanding its hint that enforcing a paramount equity might suffice as a reason for piercing the corporate veil, the Court of Appeals to date has not elaborated upon the meaning of this phrase or applied it in any case of which we are aware.") (citing *Residential Warranty v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 307, 728 A. 2d 783, 789 (1999)).  The Fourth Circuit has noted that "an obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability."  *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684 (4th Cir. 1976).  According to the Maryland Court of Appeals, courts may consider a corporation "unencumbered" by the corporate fiction to enforce a paramount equity where such disregard would "prevent evasion of legal obligations," or where "the stockholders themselves,

or a parent corporation owning a subsidiary corporation, fail to observe the corporate entity." *Bart-Arconti & Sons, Inc.*, 275 Md. at 309, 340 A.2d at 225.  In *Hildreth v. Tidewater Equipment Company*, the Court of Appeals listed "some of the factors commonly considered" in the latter circumstance: "(1) whether the corporation is inadequately capitalized, fails to observe corporate formalities, fails to issue stock or pay dividends, or operates without a profit, (2) whether there is commingling of corporate and personal assets, (3) whether there are non-functioning officers or directors, (4) whether the corporation is insolvent at the time of the transaction, and (5) the absence of corporate records."  378 Md. 724, 735, 838 A.2d 1204, 1210 (2003).  Thus, while the doctrines of fraud and paramount equity are indeed distinct, the evidence required to prove each is not mutually exclusive.  That is, discovery related to the five paramount equity factors can also be relevant to a claim that an individual structured or used the corporate form for the purpose of perpetrating a fraud. [6]

Fidelity's Amended Complaint alleges that "[t]he Business Plan Executive Summary, which upon information and belief was prepared by Defendants Qintera, Roosevans and Stoddard, contained detailed representations regarding projected revenue and expenses for 2012 through 2017, and also represented that 'Start-Up Expenses Funded by FRA' would be

---

[6] Defendants characterize Fidelity's fraud claim as sounding in "fraudulent inducement," rather than "fraud in the factotum [sic] or any other variant."  Defs.' Mot. for Protective Order ¶ 19; Defs.' Reply to Pl.'s Opp. to Defs.' Mot. for Protective Order ¶ 22 ("Further, this Court left little doubt that the claim that did survive, even if it was labeled merely fraud, was actually for fraudulent inducement.").  Defendants assert that "this distinction remains important" because "normally fraud cannot be plead [sic] in conjunction with a contract action unless it is one of fraudulent inducement," and, here, Fidelity's "specific allegations regarding [its fraud claim] are limited to alleged misrepresentations about Defendant Stoddard's role, the projections in the business plans, and the capitalization of Qintera at the time of the transaction," rather than that "Qintera's corporate form was a sham, as such allegations do not relate to fraud at all, but to paramount equity."  Defs.' Reply ¶¶ 23-26.  Essentially, Defendants' emphasize a distinction between fraud and fraudulent inducement to further their overall argument that the disputed discovery is irrelevant because it relates only to claims of paramount equity.

However, it is not appropriate for me to decide in the context of this discovery dispute whether Fidelity's fraud claim sounds in "fraud," generally, or in "fraudulent inducement," specifically.  Judge Quarles explicitly ruled that Fidelity had stated a claim for piercing based on fraud, and I decline to read further restrictions into his written opinion.

'$250,000,'" that "the representations regarding the projected revenue and expenses for Defendant Qintera contained in the Business Plan Executive Summary were false at the time they were made," that "Defendants Qintera, Roosevans and Stoddard were all aware of the falsity of these representations, or had a reckless disregard" as to their truth or falsity, and that Fidelity "reasonably relied upon . . . [these] misrepresentations regarding the projected revenue and expenses for Defendant Qintera," which caused Fidelity to incur $500,000.00 worth of damages.  Pl.'s Am. Compl. ¶¶ 43-46.

In Count II of its Amended Complaint, for "Breach of Contract Against Defendants Stoddard and Roosevans Individually by Piercing the Corporate Veil Due to Fraud," Fidelity states that "Defendants Stoddard and Roosevans entered into the Development Loan Agreement with fraudulent intent by materially misrepresenting in the Business Plan Executive Summary the financial status including projected revenues and expenses of Defendant Qintera, and implying that Defendant Qintera was financially healthy enough to repay the loan as agreed while having knowledge that Defendant Qintera was grossly undercapitalized."  *Id.* at ¶ 54. Further, in Count III of the Amended Complaint for "Unjust Enrichment Against Defendants Qintera, Stoddard and Roosevans," Fidelity asserts that "Defendants Qintera, Stoddard and Roosevans received a benefit under the Development Loan Agreement as . . . they received and used the loan proceeds of $500,000 for their own personal benefit, and/or for the benefit of other corporations, limited liability companies or other persons, in such a way that Defendant Qintera was severely undercapitalized and doomed to failure," and that "the loan proceeds were not used to ensure the success of Defendant Qintera as a business entity, but instead were used for other purposes."  *Id.* at ¶¶ 67, 68.

The above allegations may relate to, or constitute, certain of the paramount equity factors: whether Qintera was inadequately capitalized or operating without a profit, whether there was a commingling of corporate and personal assets, and whether Qintera was solvent at the time that the Loan Agreement was executed.  *See Hildreth*, 378 Md. at 735, 838 A.2d at 1210.  Upon evaluating the specific disputed deposition questions that reference the paramount equity factors, however, it is evident that the disputed discovery is indeed relevant to the existing claims and facts alleged, even if it is also relevant to theories not existing in the Amended Complaint.

As to the disputed relevance of portions of Patricia Young's deposition, Ms. Young was selected by Defendant Qintera as a corporate designee to "testify about [relevant] information known or reasonably available" to Qintera, pursuant to Federal Rule of Civil Procedure 30(b)(6).  *See* Fed. R. Civ. P. 30(b)(6); Defs.' Mot. for Protective Order Ex. B.  In the factual paragraphs of its Amended Complaint, Fidelity alleges that Ms. Young is the secretary of FRAA, Inc., that FRAA, Inc. is the new corporate name being used by FRA, that the Business Plan referred to Qintera as an "affiliate" of FRA, and that both the Business Plan and the Implementation Plan specified numerous ways in which Qintera would leverage the "existing infrastructure of FRA" through its affiliation with FRA.  Pl.'s Am. Compl. ¶¶ 29, 35, 36.

Ms. Young, as Qintera's corporate designee, was responsible for testifying to information about Qintera within the scope of the Amended Complaint.  Questions pertaining to Ms. Young's role within FRA are relevant to Fidelity's factual allegations that Ms. Young is also the secretary of FRAA, Inc. (purportedly the current name corporate of the former FRA) and that Qintera held itself out as closely related to FRA.  Questions pertaining to Qintera's corporate structure as it relates to FRA are also relevant to the above-mentioned factual paragraphs in the Amended

Complaint, and to showing that Fidelity relied on all Defendants' representations regarding Qintera's financial status and projections in entering into the Loan Agreement.

Defendants are correct, then, that Qintera's corporate structure and relationship with FRA are relevant to a paramount equity claim not existing in the Amended Complaint. However, these facts are also relevant to the allegations that remain in the Amended Complaint, which Judge Quarles ruled are sufficiently supportive of Fidelity's fraud claim. *See Fidelity & Guaranty Life Ins. Co.*, 2014 WL 346630, at \*8-9 (finding that Fidelity had pled a claim for fraud where Fidelity alleged "that the Executive Summary contained misrepresentations of . . . FRA's funding of $250,000 in start-up expenses," and that "Roosevans knew that the statements in the Executive Summary and Implementation Plan were false when he presented them to Fidelity, and that he made the misrepresentations intending Plaintiff to rely upon them.").

A similar analysis applies to Fidelity's questions during Defendant Roosevans's deposition regarding Qintera's incorporation, solvency, original and current capitalization, and shareholders and board members, which Defendants allege are relevant only to non-existent paramount equity claims. Certainly, these inquiries are relevant to factors supporting a paramount equity claim, particularly undercapitalization and failure to respect corporate formalities. However, because the facts upon which Fidelity's fraud claim is based accuse Defendant Roosevans of perpetrating a fraud on Fidelity by misrepresenting these paramount equity factors, and the facts upon which Fidelity's unjust enrichment claim is based overlap with the paramount equity factors, these inquiries are not *solely* relevant to a non-existent paramount equity claim.

Therefore, Fidelity's discovery regarding undercapitalization, commingling of funds, and other factors that could speak to the paramount equity factors could also conceivably speak to its

claims of fraud and unjust enrichment, since those claims relate to Defendants' Roosevans and

Stoddard's *knowledge* of these topics, their allegedly intentionally misleading Fidelity as to the

state of Qintera as a corporation, and their alleged misuse of Fidelity's loan funds.  *See* Pl.'s Am.

Compl. ¶¶ 43-46 (noting that "The Business Plan Executive Summary . . . contained detailed

representations regarding projected revenue and expenses for 2012 through 2017, and also

represented that 'Start-up Expenses Funded by FRA' would be '$250,000,'" and alleging that

"the financial projections were false . . . and all of the Defendants knew or should have known

that Defendant Qintera was undercapitalized at the outset" and that "Plaintiff reasonably relied

upon Defendants Qintera, Roosevans and Stoddard's misrepresentations regarding the projected

revenue and expenses for Defendant Qintera"); *id.* at ¶ 54 (alleging in "Count II of the Amended

Complaint for Breach of Contract Against Defendants Stoddard and Roosevans Individually by

Piercing the Corporate Veil Due to Fraud" that "Defendants Stoddard and Roosevans entered

into the Development Loan Agreement with fraudulent intent by materially misrepresenting . . .

the financial status . . . of Defendant Qintera, and implying that Defendant Qintera was

financially healthy enough to repay the loan as agreed while having knowledge that Defendant

Qintera was grossly undercapitalized"); *id.* at ¶ 55 ("Defendants Stoddard and Roosevans entered

into the Development Loan Agreement with fraudulent intent by materially misrepresenting their

intentions with respect to the use of the loan proceeds.").  As such, a protective order for

Defendant Roosevans's deposition testimony on the ground of relevance is unwarranted here.

Finally, Defendants seek a protective order for the information requested in the

subpoenas issued to the Paragon entities.  As a rule, "a party does not have standing to challenge

a subpoena issued to a non-party" absent exceptional circumstances where the challenging party

"claims some personal right or privilege in the information sought by the subpoena." *Corsair*

*Special Fund, L.P. v. Engineered Framing Sys., Inc.*, No. PWG-09-1201, 2011 WL 3651821, at *2 (D. Md. Aug. 17, 2011) (citing *United States v. Idema*, 118 Fed. App'x 740 (4th Cir. 2005)). In the instant case, Defendants seek a protective order only on the basis that the subpoenas "seek a veritable litany of documents and information . . . solely related to a claim of paramount equity and having no basis to existing claims in the First Amended Complaint."  Defs.' Mot. for Protective Order ¶ 37.  Because there is no personal right or privilege involved in this challenge, the exception does not apply, and Defendants lack standing for their request.

In their Reply to Fidelity's Opposition, Defendants assert that the factual paragraphs which only support Fidelity's failed paramount equity claims should not be considered by the Court and should be subject to a protective order because they do not support an independent theory of recovery.  This argument is properly construed as a request to strike these factual allegations from the Amended Complaint, and will be discussed in the analysis of Defendants' pending Motion to Strike.

### ii. Defendants Will Not Suffer Prejudice, Embarrassment, or Harassment if the Discovery is Not Subject to a Protective Order

As noted above, a protective order is appropriate if the moving party can show that failing to issue the order would subject it to "annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1).  Here, Defendants have not made any such allegations, and the record does not support such findings.  Therefore, on Defendants' relevance arguments alone, Defendants' Motion for Protective Order is denied.

### C.  Defendants' Motion to Strike and for Sanctions

Defendants also filed a Motion to Strike that is nearly identical in substance to their Motion for Protective Order.  *See* [ECF No. 105].  Specifically, they argue that Fidelity "conducted aggressive discovery to 'bootstrap' a paramount equity claim it knew was irrelevant

to the other claims in the First Amended Complaint," and that, under the Court's "inherent authority to regulate discovery," appropriate sanctions would be to "strike evidence relevant to a paramount equity claim" from Fidelity's motion seeking leave to file a second Amended Complaint and from all testimony and documents obtained in discovery related to paramount equity issues, and to "award costs to Defendants entailed in responding to and fighting irrelevant discovery requests."  Defs.' Mot. to Strike 3, 10, 11.

As a preliminary matter, Defendants' motion to strike material from Fidelity's motion for leave to file a second amended Complaint is denied as moot, since Judge Quarles has already ruled on that motion.  *See Fidelity & Guaranty Life Ins. Co.*, 2016 WL 158512, at *7 (D. Md. Jan. 12, 2016).  The remaining arguments in Defendants' Motion to Strike are addressed below.

### 1. Legal Standard

Federal Rule of Civil Procedure 12(f) permits courts to strike "any redundant, immaterial, impertinent, or scandalous matter" from a pleading.  Fed. R. Civ. P. 12(f).  However, motions to strike are generally disfavored.  *See Schultz v. Braga*, 290 F. Supp. 2d 637, 655-56 (D. Md. 2003), *aff'd*, 455 F.3d 470 (4th Cir. 2006).  While the Court may exercise its discretion and power over the litigation to grant such a motion, then, there is "general judicial agreement, as reflected in the extensive case law on the subject," that motions to strike "should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action."  5C Charles A. Wright & Arthur R. Miller, et al., *Federal Practice & Procedure* § 1382 (3d ed. 2015).

### 2. Analysis

Defendants request that the Court strike "all exhibits contained and appended to [Fidelity's] motion to amend its Complaint, all testimony adduced in corporate depositions

relating to paramount equity issues, and any other documents obtained in discovery related to that issue . . . for the remainder of the instant matter."  Defs.' Mot. to Strike ¶ 42.  Defendants' motion is denied for two reasons.

First, the exhibits attached to Fidelity's motion for leave to amend are now either moot (in the case of the proposed amended complaint), or have been deemed properly discoverable and not subject to protective order.  The exhibits therefore necessarily have some possible relation or logical connection to the subject matter of the controversy, such that, under the Rule 12(f) standard, striking them would be inappropriate.  *See Piotrowski v. Wells Fargo Bank, N.A.*, No. DKC-11-3758, 2013 WL 247549, at *13 n.14 (D. Md. Jan. 22, 2013) ("Wells Fargo also asks that the first eight pages of the complaint be stricken because they 'contain a diatribe of allegations relating to foreclosures which have *nothing* to do with the claims advanced by the Plaintiff.' . . . Although it does appear that many of the allegations in the first portion of the complaint are irrelevant to Mr. Piotrowski's individual claims, it cannot be said that they "have no possible relation to the controversy" or that leaving them intact would somehow prejudice Wells Fargo. Thus, Wells Fargo's informal request to strike will be denied."); *T.P. Labs, Inc. v. Huge*, 197 F. Supp. 860, 861 (D. Md. 1961) (denying Defendant's motion to strike and noting that "Plaintiff is not asserting a cause of action based upon a wrongful disclosure of confidential information . . . [but rather is] attempt[ing] . . . to set forth background information [that] may be relevant to show a deliberate, wilful [sic] and intentional infringement.").

Second, the disputed discovery is neither redundant nor scandalous, nor is it impertinent. As part of its fraud claim, Fidelity intends to prove that all Defendants materially misrepresented Qintera's financial condition, and used Qintera's affiliation with FRA to carry out that misrepresentation.  Thus, the deposition testimony that reflects Qintera's finances and

relationship with FRA is certainly pertinent to the litigation.  As part of its unjust enrichment claim, Fidelity intends to prove that all Defendants used the loan proceeds for their own personal benefit in such a way that Defendant Qintera was severely undercapitalized.  Thus, deposition testimony that reflects funds-sharing, capitalization of Defendant Qintera, and personal enrichment of any Defendants or entities in which they have a stake or control, is also pertinent.

In their Reply to Fidelity's Opposition to their Motion for Protective Order, Defendants allege that Fidelity's factual paragraphs supporting a theory of alter-ego against FRA, which remain in the Amended Complaint despite this Court's earlier rejection of such a claim in Fidelity's first motion to amend, cannot be used to support discovery for existing claims.  Defs.' Reply to Pl.'s Opp. ¶ 29.  Specifically, Fidelity's Opposition cites paragraphs 34-37, 43, and 44 of the Amended Complaint, which allege that "the Implementation Plan assigns numerous tasks to be completed for Defendant Qintera" by Dave Wolf, Linda Bays Powers, and Patricia Young, all of whom, Fidelity asserts, have corporate governance roles in both FRA and in Qintera, that the Implementation Plan "contained numerous references to the use of FRA's policies and resources for Defendant Qintera," that the Business Plan Executive Summary discussed FRA's start-up funding of Qintera, and that all Defendants knew or should have known that Qintera was undercapitalized.  *Id.* at 4-5.

While the disputed factual paragraphs may have been initially intended to support Fidelity's alter ego or paramount equity claim, they also support Fidelity's claims for fraud. Since Fidelity also asserts throughout the Amended Complaint and related exhibits that part of Qintera's purported financial stability stemmed from its relationship with FRA, and that Fidelity entered into the Loan Agreement based on its understanding that Qintera was a viable

corporation, factual allegations regarding Qintera's corporate governance vis-à-vis FRA's, as well as Qintera's financial standing, are relevant to Fidelity's surviving fraud claim.

The factual allegations are thus related to the suit, even if they do not independently establish a theory of recovery. *See Lane v. Page*, 727 F. Supp. 2d 1214, 1230-31 (D.N.M. 2010). Moreover, permitting Fidelity's factual allegations related to a failed paramount equity claim to remain does not mean that the paramount equity claim will suddenly become part of the Amended Complaint despite its earlier rejection. *See id.* at 1230 ("The Court also agrees that, if the Court grants the motion to amend and the amended complaint includes factual allegations that primarily support theories of recovery that the Court has dismissed, those theories will not spring back to life."). There is no dispute that Fidelity's Amended Complaint contains a count for veil piercing only based on fraud, and, consequently, does not allege piercing based on paramount equity.

### D. The Paragon Entities' Motion to Quash

The Paragon entities filed a Motion to Quash the Subpoenas *duces tecum* issued to them by Fidelity, asserting two bases: first, that the subpoenas violate Federal Rule of Civil Procedure 45(d)(3)(A)(i) by providing each Paragon entity only seven days to comply, and second, that the subpoenas violate Federal Rule 45(d)(3)(A)(iii) and (iv) by requiring the disclosure of matters "expressly forbidden from discovery by [this] Court's prior order," and by subjecting the Paragon entities to an undue burden.

Federal Rule 45(d)(3) directs courts to quash or modify a subpoena that, *inter alia*, "fails to allow a reasonable time to comply," "requires disclosure of privileged or other protected matter," or "subjects [the recipient] to undue burden." Fed. R. Civ. P. 45(d)(3)(A). While courts differ on which time periods for compliance meet Rule 45's reasonableness requirement, on the facts of the instant case, the seven day period Fidelity afforded the Paragon entities to respond

does not.   *See Ike-Ezunagu v. Deco, Inc.*, No. RWT-09-526, 2010 WL 4822511, at *2 (D. Md. Nov. 22, 2010) ("Requiring individuals to appear for depositions two to three days before Thanksgiving on—at most—eight days' notice does not provide these individuals with "reasonable time to comply."); *Deakins v. Pack*, No. CIV-19-1396, 2012 WL 626200, at *2 (S.D. W. Va. Feb. 24, 2012) ("Plaintiffs' subpoena dated February 2, 2012, commands [the third party] to produce 'all medical records [of Defendants] for the previous ten years . . . no later than 02/07/2012.  The Court finds that four days is not a reasonable amount of time for [the third party] to comply.").

The subpoenas issued to the Paragon entities seek all documents related to each of the Paragon entities' ownership of shares of Qintera from January 1, 2008 through the present, documents related to the ownership and use of office space located at Qintera's business address, including the lease agreements and payments received from any entity for use of that office space, documents related to funds received by each of the Paragon entities from Qintera from January 1, 2008 through the present, all tax returns from 2008 to present, and all 1099s issued from Qintera to each Paragon entity from 2008 to present.  Defs.' Mot. for Protective Order Ex. E.  Requiring a response to these extensive requests in seven days—which, it must be noted, is seven days less time than the fourteen days afforded to parties to raise objections to such requests by Federal Rule 45(d)(2)(B)—is unreasonable.[7]  *See McAfee v. Boczar*, No. CV-11-646, 2012 WL 2374173, at *3 n. 3 (E.D. Va. June 22, 2012) (finding a seven-day response time adequate

---

[7] In its Opposition to the Motion to Quash Subpoenas, Fidelity argues that, had Defendant Roosevans's counsel accepted service on behalf of The Paragon Trust, as that entity's sole trustee, and Paragon Financing Services, LLC, as that entity's sole member, on March 25, 2015, when the subpoenas were first issued, the compliance time for response to the subpoenas would have been fifteen days from date of service.  Pl.'s Opp. to Paragon's Mot. to Quash 3-4.  Instead, Fidelity asserts, counsel for Roosevans waited until the close of business on Friday, March 27, 2015 to refuse to accept service of the subpoenas, such that Fidelity had to hire a process server, who made attempts to serve Defendant Roosevans from March 30, 2015, until Roosevans was finally served on April 2, 2015, and then had only seven days to comply.  *Id.* at 4.  This argument is unpersuasive to show the reasonableness of the response time, because it is within counsel for Roosevans's prerogative to accept service or not.

where the third party "fail[ed] to demonstrate why the subpoena provided an unreasonable amount of time under Rule 45," but nevertheless modifying the time frame to "permit a viable return date"); *Dixon v. Greyhound Lines, Inc.*, No. JWD-RLB-13-179, 2014 WL 6474355, at *4 (M.D. La. Nov. 19, 2014) (noting that the amount of time for compliance must be tailored to the volume and type of documents requested); *cf. Hall v. Louisiana*, BAJ-RLB-12-657, 2014 WL 1652791, at *13 (M.D. La. Apr. 23, 2014) (quashing subpoenas that gave non-parties between nine and twelve days to comply because those timeframes were "clearly unreasonable, particularly when then 14 day period for serving objections [under Rule 45(d)(2)(B)] is generally considered a reasonable time.").

While the Paragon entities' assertions regarding the unreasonableness of the compliance period are correct, their other arguments lack merit.  As addressed above in the discussions of Defendants' Motion for Protective Order and Motion to Strike, discovery related to Qintera's capitalization and corporate structure is relevant to the remaining issues in Fidelity's Amended Complaint.  The discovery requested in the subpoenas to the Paragon entities is also relevant to Fidelity's claims of unjust enrichment, which allege that Defendant Roosevans used Fidelity's loan proceeds "for his own personal benefit and/or for the benefit of other corporations or limited liability companies or other persons, in such a way that Defendant Qintera was severely undercapitalized."  Pl.'s Am. Compl. ¶ 67.  As revealed during Defendants Roosevans and Stoddard's respective depositions, Defendant Roosevans is a beneficiary and grantor of The Paragon Trust, The Paragon Trust and Roosevans were the sole shareholders of Qintera at its inception in 2008, Defendant Stoddard had sole control as trustee of The Paragon Trust in 2011, and FRA fell under the control of The Paragon Trust.  This close relationship between the individual defendants, the Paragon entities, and FRA, could give rise to a reasonable inference of

24

improper sharing or misuse of funds, which are allegations that fall within the scope of Fidelity's unjust enrichment claim.   Discovery related to the Paragon entities' relationship with all Defendants is therefore relevant.

Given the relevance of the subpoenaed documents, I find that it is appropriate to modify, rather than quash, the subpoenas issued to the Paragon entities.   Accordingly, the Paragon entities must respond to Fidelity's subpoenas *duces tecum* **within fourteen (14) days from the date of this Order**.

### E.  Monetary Sanctions

Both Defendants and the Paragon entities contend that Fidelity should be sanctioned for having "deliberately flouted the guidance of this Court."   Defs.' Mot. for Protective Order ¶¶ 41, 42.  In light of the rulings made herein, sanctions are inappropriate.

## IV.  CONCLUSION

For the reasons stated above, Defendants' Joint Motion for Protective Order, [ECF No. 102], is DENIED, Defendants' Motion to Strike, [ECF No. 105], is DENIED, and the Paragon entities' Motion to Quash, [ECF No. 115], is DENIED, with the qualification that the subpoenas *duces tecum* will be modified to allow fourteen days from the date of this Order for compliance.

Dated: February 17, 2016

_____/s/_____
Stephanie A. Gallagher
United States Magistrate Judge